NOS. 4-97-0183, 4-97-0184 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

ILLINOIS REPUBLICAN PARTY,     ) Petition for Review

Petitioner,             ) of an Order of the

v.   (No. 4-97-0183) ) Illinois State Board

STATE BOARD OF ELECTIONS OF THE ) of Elections

STATE OF ILLINOIS, and THE ) 

DEMOCRATIC PARTY OF ILLINOIS,    ) Nos. 97CD1

          Respondents,             ) 

and                     ) 

ILLINOIS REPUBLICAN PARTY,     ) 

Petitioner,            ) 

v. (No. 4-97-0184) ) 

STATE BOARD OF ELECTIONS OF THE ) 

STATE OF ILLINOIS, and THE )     97CD2 

UNITED DEMO­CRATS OF ILLINOIS, ) 

Respondents.           ) 

_________________________________________________________________

JUSTICE McCULLOUGH delivered the opinion of the court:

This is a direct appeal of orders of the Illinois State Board of Elections (Board) dismissing the complaints of the Illi­nois Republican Party (Republican Party), alleging violations of the campaign disclosure requirements of the Elec­tion Code (10 ILCS 5/9-1 
et
 
seq
. (West 1996)), against respon­dents, Democratic Party of Illinois (Democratic Party) and Unit­ed Demo­crats of Illinois (United Democrats).  Although the Board is properly a respondent for the purpose of appeal, it has filed no brief and any reference to "respondents" refers to the Democratic Party and the United Democrats and not the Board.  The com­plaints al­leged the Unit­ed Demo­crats vio­lat­ed sec­tion 9-3 of the Campaign Disclo­sure Act, re­quiring the filing of a state­ment of organiza­tion by every polit­ical commit­tee (10 ILCS 5/9-3 (West 1996)), and that 

both re­spon­dents vio­lated sec­tion 9-10 of the Election Code, re­quiring the fil­ing of re­ports of cam­paign con­tributions and ex­pen­di­tures of politi­cal com­mit­tees (10 ILCS 5/9-10 (West 1996)), all in connec­tion with the Novem­ber 1996 general elec­tion.  The dis­miss­al orders were based not on the mer­its of the com­plaints, but on the Board's "dead­lock" vote and conse­quent in­abil­i­ty to achieve the stat­u­to­ri­ly mandated five-mem­ber vote to en­able any ac­tion of the Board to become ef­fec­tive.  See 10 ILCS 5/1A-7 (West 1996).  Appeal was brought di­rectly to this court pursuant to section 9-22 of the Election Code.  10 ILCS 5/9-22 (West 1996).

The Republican Party requests that this court re­verse the orders of the Board, enter a finding that the com­plaints were filed on "justifiable grounds," and remand to the Board with directions that a public adjudicative hearing be held on the complaints, or, in the alternative, that we remand to the Board "for reconsideration and entry of proper findings."  The respon­dents essentially contend the Board's dismissal is unre­viewable and this court is with­out ju­ris­dic­tion to fash­ion any relief because it can neither expropriate one of the "deadlock" votes and substitute its own, nor com­pel a ma­jor­i­ty vote.

The procedural background is as follows.  Following re­ceipt of the com­plaints, an inves­tiga­tory hear­ing was held be­fore a hearing exam­in­er to de­termine whether the complaints were filed on "jus­tifi­able grounds" and had some basis in law and fact.  See 26 Ill. Adm. Code §125.252 (1996).  Following submission of evi­dence and argu­ments by the parties, the hearing offi­cer pre­pared a re­port to the Board expressing the opinion that the com­plaints were filed on "justi­fiable grounds" and rec­om­mend­ing that the matter be subject to public adjudica­tive hear­ings.  The Board's gen­eral counsel informed the Board of his agree­ment with the hear­ing officer's recom­mendation and his adop­tion of those re­marks as his own. 

The membership of the Board consists of eight mem­bers, four of whom are residents of Cook County and four of whom are resi­dents outside Cook County.  The membership as to each area shall be two affiliated with the same political party as the gov­er­nor and two affiliated with the political party whose nominee for governor received the second highest number of votes.  10 ILCS 5/1A-2 (West 1996).

The Board met on March 17, 1997, to consider the com­plaints and the examiner's report.  Counsel for both par­ties ap­peared and presented argu­ments on the evi­dence submitted to the examin­er.  A mo­tion was made to find that the com­plaints were filed on "jus­tifi­able cause."  Four members voted in favor of the mo­tion and three against, so the Board did not achieve the five-vote ma­jority nec­es­sary for any action of the Board to be­come ef­fec­tive (10 ILCS 5/1A-7 (West 1996)).  The gen­eral coun­sel was asked what should be done to give the parties an order that was final for purposes of appeal.  In response, a second motion was made, ap­proved unan­i­mously by the seven members pres­ent, "that the Board [,]having con­sidered the complaint and being unable to agree by a vote of five upon a decision, *** dismisses the com­plaint for grounds of proce­dure and not on the merits."  A writ­ten order was en­tered dis­missing the com­plaints with no de­ter­mina­tion as to whether they were filed on justi­fi­able grounds.  

We first address the question of whether the Board's four-to-three vote, the basis for the unani­mous vote dismissing the complaint, is re­view­able by this court.  This is an issue of first impres­sion in Illinois and, as far as we have determined, no similar fac­tu­al sce­nar­io has been ad­dressed in a sister-state jurisdiction.  There are two federal cases interpreting similar provisions of the federal election campaign act, which we invited the parties to brief fol­lowing oral argument in this case.  See 
Demo­crat­ic Con­gres­sio­nal Cam­paign Com­mit­tee v. Fed­eral Elec­tion Comm'n
, 831 F.2d 1131 (D.C. Cir. 1987); 
Com­mon Cause v. Federal Election Comm'n
, 842 F.2d 436 (D.C. Cir. 1988).

The respondents contend that the 1970 Illinois Consti­tu­tion cre­ating the Board, and the Elec­tion Code pursuant to which the Board is organized, envi­sion the likelihood of dead­lock vot­ing, since the Board's membership must be equally bal­anced be­tween the two major political par­ties.  See Ill. Const. 1970, art. III, §5; 10 ILCS 5/1A-2 (West 1996).  Respondents conclude, therefore, that it is within the powers and preroga­tives of the Board to resolve issues before it by deadlock vote and, absent any statutory method for break­ing that deadlock, this court lacks the abili­ty to alter the constitutional and statutory framework by which the Board has acted.

This contention is not persuasive or supported by the constitu­tional and statutory provi­sions.  Article III, section 5, of the 1970 Illinois Constitu­tion pro­vides:

"A State Board of Elections shall have gener­al supervision over the administration of the registration and election laws throughout the State.  The General Assembly by law shall determine the size, manner of selection and compensation of the Board.  No political party shall have a majority of members of the Board."  Ill. Const. 1970, art. III, §5.

Various provisions of the Election Code out­line a broad grant of power and du­ties of the Board in con­nec­tion with the administra­tion of the regis­tra­tion and elec­tion laws (10 ILCS 5/1A-8 (West 1996)), and expressly authorize the Board to conduct investiga­tions and in­quiries related to political campaign disclosure re­quire­ments (10 ILCS 5/9-18 (West 1996)), hold hearings on com­plaints alleging violation of the campaign disclosure require­ments of the Election Code (10 ILCS 5/9-21 (West 1996)), im­pose civil pen­al­ties for noncompliance with its orders (10 ILCS 5/9-23 (West 1996)), and petition the circuit court to compel compli­ance with its orders (10 ILCS 5/9-24 (West 1996)).  Nothing within this broad constitutional and statutory framework indi­cates that the Board may abdi­cate its obli­ga­tion, by rea­son of dead­lock vote, to address and ameliorate vio­lations of the Elec­tion Code, and thereby forever insulate its fail­ure to act from judi­cial review.  Sec­tion 9-22 of the Elec­tion Code express­ly pro­vides:

"Any party to a Board hearing, any per­son who files a complaint on which a hearing was denied or not acted upon within the time specified in Section 9-21 of this Act, and any party adversely affected by a judgment of the Board may obtain judicial review, which shall be governed by the provisions of the Administrative Review Law."  10 ILCS 5/9-22 (West 1996). 

The plain lan­guage of sec­tion 9-22 pro­vides for judi­cial re­view to "any par­ty," or "any person" filing a com­plaint, wheth­er or not the Board has taken any ac­tion.  There is nothing within that section, nor any other provision of the Election Code, that pre­cludes judicial review in the event of a deadlock vote by the Board.  The prac­tical ef­fect of the Board's deci­sion in this in­stance, dis­missal of the com­plaint for failure to achieve the requisite vote rather than on the mer­its, is to leave one party "ad­versely affected by a judgment of the Board," a scenario in­dis­tinguish­able from a dis­missal based on a 5 to 3, or an 8 to 0 vote, an outcome fully encompassed by the language of section 9-22 of the Elec­tion Code.  We therefore conclude that the Board's "dead­lock" vote, four votes in favor and three votes against a find­ing of "justifi­able grounds" for holding a public adjudicato­ry hear­ing, is re­view­able by this court.

Our decision to review the Board's action is supported by cases from the federal courts ad­dressing similar issues aris­ing from complaints alleg­ing viola­tions, by political par­ties, of the fed­eral elec­tion cam­paign act.  In 
Democratic Congres­sio­nal Campaign
, the six-mem­ber Fed­er­al Elec­tion Commis­sion (FEC) dis­missed a complaint following a dead­lock vote on a proposed find­ing that there existed "rea­son to be­lieve" the Na­tion­al Re­pub­lican Cam­paign Com­mit­tee had vio­lated certain spending limit provi­sions of the federal act.  The general coun­sel for the FEC had rec­om­mend­ed making such a finding based on FEC prece­dent.  Judicial review pro­vi­sions of the fed­er­al act pro­vid­ed that "[a]ny party ag­grieved by an order of the Commis­sion dismiss­ing a com­plaint *** or by a fail­ure of the Commission to act on such com­plaint" dur­ing the statu­tory period could file a petition for review in the district court.  2 U.S.C. §437g(a)(8)(A) (1982).  The court could declare the dis­missal or the fail­ure to act as con­trary to law.  2 U.S.C §437g(a)(8)(C) (1982).  In af­firming the dis­trict court's find­ing that dismissal of the complaint was review­able, the court of ap­peals found that nothing in the act's judi­cial review pre­scrip­tion precluded re­view of a dismiss­al due to dead­lock.  
Demo­crat­ic Con­gres­sio­nal Cam­paign
, 831 F.2d at 1133.  

Similarly, in 
Common Cause
 the FEC entered a tie-vote dis­miss­al of a com­plaint alleging violations of politi­cal cam­paign dis­clo­sure requirements.  The general counsel's recom­mend­ation of going forward with the complaint was based on an as­sess­ment of what the law required in light of the factu­al alle­ga­tions of the case, rather than on precedent.  In finding the ab­sence of pre­ce­dent guiding the gen­er­al coun­sel's recommendation not deter­mina­tive, the court found no prin­ci­pled dis­tinc­tion be­tween the facts in 
Demo­cratic Con­gres­sional Cam­paign
 and those before it that would insulate review of the FEC's decli­na­tion to pro­ceed, con­trary to the rec­om­men­da­tions of its general coun­sel.  
Com­mon Cause
, 842 F.2d at 449.

Although we hold the Board's deadlock vote is re­view­able by this court, we decline at this point to address the mer­its and enter find­ings on whether the complaints pres­ent jus­tifi­able grounds.  We conclude better policy dictates that we remand to the Board for a statement of reasons by those members reject­ing the recommendation of the hearing examiner and their general counsel.  It is the Board and not this court that has been con­stitutionally and statutorily entrusted with the duty and obliga­tion to address the merits in the first instance.  We con­cur with the views expressed by the feder­al courts for requiring the Board members to state of record the reasons for their vote:  such practice facilitates meaning­ful judi­cial re­view of a dead­lock deci­sion, con­trib­utes to rea­soned decision making, en­sures re­flec­tion and an oppor­tunity for self-correction, and enhances the predict­ability of commis­sion deci­sions for future litigants.  See 
Common Cause
, 842 F.2d at 449.  Our decision to remand to the Board is further supported by 
Reinhardt v. Board of Edu­ca­tion of Alton Community Unit School District No. 11
, 61 Ill. 2d 101, 103-04, 329 N.E.2d 218, 220 (1975), where the su­preme court found that a decision of an ad­min­is­tra­tive agency must contain findings from the evi­dence so as to make judicial review of that deci­sion pos­si­ble, and when it does not, it must be remanded to the agen­cy.

While we decline at this point to address the merits, we deem it appropriate to address the pure­ly legal and con­sti­tu­tion­al "defenses" put forth by re­spon­dents. If the de­fenses have merit, there would be nothing further for the Board to address.  If the defenses are invalid, our reso­lu­tion will aid the Board in focusing on the merits upon remand.  The standard of review nec­essarily is 
de
 
novo
 for two reasons.  First, since the Board entered no factual findings on the merits, there is nothing to which this court can accord deference.  See
 Jackson v. Board of Review
, 105 Ill. 2d 501, 513, 475 N.E.2d 879, 885 (1985) (the factual findings of an administrative agency will not be reversed unless they are against the manifest weight of the evi­dence).  Second, the legal defenses raised present a ques­tion of law and a re­view­ing court will not defer to an agency decision based on an erro­neous applica­tion of the law.  
Nichols v. De­part­ment of Em­ploy­ment Secu­ri­ty
, 218 Ill. App. 3d 803, 809-10, 578 N.E.2d 1121, 1126-27 (1991).

The record indicates that on November 1, 1996, the exec­u­tive di­rec­tor of the Republican Party sent a letter to the gen­er­al coun­sel for the Board indicating that it was a com­plaint against the respondents and alleging violations of the Election Code.  The letter, which was later attached to a com­plaint filed on the Board's form D-4 on February 19, 1997, was re­ceived on No­vem­ber 4.  The Board took no ac­tion with re­spect to the No­vem­ber 4 letter despite numerous in­quiries from the exec­u­tive direc­tor of the Republican Party.  On February 7, 1997, the gen­eral coun­sel wrote a letter to attorneys for the Republi­can Party indicat­ing that "the matters [alleged] are not ones which the Board would pursue on its own independent­ly if there is a complainant already apprised of the facts to be pre­sented and able to under­take prosecution of the complaint on its own.  In short, the Board acts in such matters as a forum, not as the advocate."  The general counsel advised that if the Re­publi­can Party wanted to pursue the matter further it should file a D-4 complaint under the provisions of the Election Code.

The re­spon­dents argue that the No­vem­ber 4 let­ter con­sti­tut­es a verified com­plaint because it satisfied "all the ele­ments" re­quired by sec­tion 9-20 of the Election Code.  10 ILCS 5/9-20 (West 1996).  Respondents claim that since the Board failed to take action on the November 4 complaint with­in the time provided for under section 9-21 of the Election Code (10 ILCS 5/9-21 (West 1996)), which at most would have been 42 days after Novem­ber 4, 1996, the Re­publican Party was required to file a petition for judicial re­view in this court within seven days thereafter, or no later than December 31, 1996.  Since the Re­pub­lican Party failed to do so, it has allegedly waived, 
i.e.
, for un­time­li­ness, its right to pur­sue the instant complaint or has slept on its rights and is barred by 
laches
.  The general counsel had advised the Board that the November 4 letter was not a valid complaint and had not been filed on form D-4.

As the Republican Party notes, there is no specified time limitation for filing a complaint--the time provisions spec­ified in section 9-21 of the Campaign Disclosure Act apply only after a com­plaint has been filed.  No one disputes that if the com­plaint of Feb­ru­ary 19, 1997, is not barred by the November 4 filing, it is valid.  The issue then is whether the November 4 letter was a valid com­plaint.

Sec­tion 9-20 of the Election Code provides that a "ver­i­fied com­plaint shall be direct­ed to a candidate or the chairman or trea­surer of a politi­cal commit­tee." 10 ILCS 5/9-20 (West 1996).  The November 4 letter is addressed to the Board's gen­er­al coun­sel and not to respondents.  The general counsel ad­vised the Re­pub­li­can Party that the Board would not prosecute an action on its own due to its role as a forum rather than as a party.

The November 4 complaint was directed to neither of the re­spon­dents and does not name them as parties-respondent.  No record evidence shows that they were served with pro­cess as pro­vid­ed in sec­tion 125.240 of the Board's rules and regula­tions.  See 26 Ill. Adm. Code §125.240 (1996) (a com­plaint filed with­in 60 days of an elec­tion re­quires written ac­knowledg­ment by the person served, per­so­nal de­liv­ery evidenced by an affi­davit of the person making deliv­ery, or abode service in accordance with the Civil Prac­tice Law (see 735 ILCS 5/2-101 through 2-2109 (West 1996))).  The No­vem­ber 4 let­ter lacked the most fun­damental ele­ments of notice and join­der and did not con­sti­tute a valid com­plaint.  The No­vem­ber 4 com­plaint was con­sid­ered in­val­id by the Board's gener­al counsel for not having been prop­erly filed on form D-4.  Nei­ther time­li­ness nor 
la­ches
 barred the Re­pub­li­can Party from sub­se­quently fil­ing the Feb­ruary 19, 1997, com­plaint.

Respondents maintain that sec­tion 100.10(f)(3) of the Board's general rules and regula­tions (26 Ill. Adm. Code §100.10(f)(3) (1996))--which re­spon­dents claim is un­con­sti­tu­tion­al­ly vague--is a "le­gal pred­i­cate" for the Republi­can Party's com­plaints.  That section pro­vides:

"If a person or whoever solicits or receives funds for political purposes or acts as a conduit for political funds, he or she would, in fact, become a political committee and have to comply with all provisions of the Illinois Campaign Financing Act."  26 Ill. Adm. Code §100.10(f)(3) (1996).

Respon­dents claim that the meaning of "conduit" is un­con­sti­tu­tion­ally vague and the foundation of the com­plaints rests on the meaning of this term.

Contrary to respondents' contention, however, the com­plaints cite stat­u­to­ry sec­tions 9-3, 9-4, 9-10, and 9-11 of the Election Code as the basis of the alleged violations, and not the regu­la­tions.  Sec­tion 9-3 pro­vides:  "Every state political com­mittee and every local political committee shall file with the [Board] *** a statement of organiza­tion with­in 30 days of the creation of such com­mit­tee."  10 ILCS 5/9-3 (West 1996).  Section 9-10 provides:

"The treasurer of every state political com­mittee and the treasurer of every local po­litical committee shall file with the Board *** reports of campaign contributions and expenditures on forms to be prescribed or approved by the Board." 10 ILCS 5/9-10 (West 1996).

In order for section 100.10(f)(3) of the regulations to be rele­vant to the complaints, the United Democrats and the Democratic Party would have to maintain that their status as state and local political committees is disputed.  They have made no claim that they are not.  The Democratic Party admitted that the Unit­ed Democrats is its poli­tical sub­committee.  In any event, it is not disputed that the Unit­ed Democrats and the Democratic Party have solicited and received funds for polit­ical purposes.  Therefore, even under the regulation in section 100.10(f)(3), they meet the defi­ni­tion of a political party sub­ject to report­ing requirements of the Elec­tion Code.  Whether the meaning of "con­duit" in sec­tion 100.10(f)(3) of the regulations is unconstitutionally vague is ir­rel­e­vant to a determination of whether they have fulfilled their statutory obligations as state and local political commit­tees to adhere to the requirements of sections 9-3, 9-4, 9-10, and 9-11 of the Election Code.

Finally, we note that the Republican Party raised at oral argument and in subsequent briefs filed with this court a con­struction of section 9-21 of the Election Code (10 ILCS 5/9-21 (West 1996)) that had not been pres­ented to the hearing officer or the Board or in­cluded in its initial briefs filed in this court.  Under such circumstances, the ques­tion is waived.  155 Ill. 2d R. 341(e)(7); 
Veteran Supply Co. v. Swaw
, 192 Ill. App. 3d 286, 289, 548 N.E.2d 667, 669 (1989).  Even if not waived, the conten­tion raised by the Republican Party, that sec­tion 9-21 requires a five-vote majority only to 
dismiss
 a com­plaint (the cor­ollary being that all complaints automatically receive a pub­lic hearing absent five votes to dismiss), is belied by sec­tion 1A-7 of the Elec­tion Code, which requires five votes for 
any
 action of the Board to become effective.  10 ILCS 5/1A-7 (West 1996).  As noted by the hearing examiner, the purpose of a closed prelimi­nary hearing is "to prevent the Board being made an in­strument for the trans­mission of unfair accusations of wrongdo­ing made by political partisans against their opponents under circum­stances in which the accused have an unfair and inadequate oppor­tunity to defend themselves, such as untrue or ill-founded accu­sations filed a scant few days before an elec­tion."  Such purpose might be sub­verted were all complaints subject to public scrutiny ab­sent a five-vote bipartisan consensus.

The case is remanded to the Board for proceedings ­con­sis­tent with the views expressed in this opinion.

Remanded.

GARMAN, P.J., concurs.

GREEN, J., specially concurs in part and dissents in part.

JUSTICE GREEN, specially concurring in part and dis­sent­ing in part:

I concur in the decision of the majority to re­mand.  However, I would reverse and remand to the Board with directions to grant the Republican Party a public adjudicatory hearing on its com­plaints.

Technically, the review before us is from an order of the Board entered on 
March 19, 1997, by which the Board voted unanimously to dismiss the complaints because of the deadlock in its previous voting.  The issue before the Board had been whether the complaints were filed on "justifiable grounds" and had some basis in law and fact.  I agree with the majority that these issues were timely and properly before the Board.  Regardless of the split on the vote, the ultimate decision of the Board was a final denial of the Republican Party's complaints.

When a complaint such as that here is timely brought before the Board and it has jurisdiction, I conclude the com­plaint cannot properly be dismissed in bar of action if the deci­sion is contrary to the manifest weight of the evidence.  
People ex rel. Stephens v. Collins
, 35 Ill. 2d 499, 500, 221 N.E.2d 254, 255 (1966); 
Dorfman v. Gerber
, 29 Ill. 2d 191, 196, 193 N.E.2d 770, 773 (1963).  That is the usual rule in regard to decisions of administrative agencies, and 
such was the case here.  In di­rect­ing a result on administrative review in such circum­stanc­es, we are not putting ourselves in the position of the Board to any greater extent than is always done by a court sit­ting in judicial review of an administrative decision.

At the hearing before the Board, the exhibits of the Republican Party included the following:  (1) an advertise­ment for a $100-per-ticket fundraiser featuring Hillary Clinton and stating that the event was a joint fundraiser for "Friends of Dick Durbin" and the United Democrats; (2) a newspaper article indi­cating that, accord­ing to chairman Tom Hynes, the United Democrats possessed a $1.4 million campaign fund and was an um­brella group primarily receiv­ing its money from the Democratic National Committee; (3) a press release dated November 3, 1996, on letter­head of the United Democrats indicating that it is a committee of the Democratic Party created by resolution in April 1996 and disclosing that the press release was paid for by the United Democrats, a committee of the Democratic Party; (4) a page from a campaign disclosure report of the "Friends of Michael J. Madigan" political committee reporting a contribution of $35,000 to it by the United Demo­crats, listing a Chicago address differ­ent from that of the Democratic Party; (5) a Cook County Demo­cratic Party campaign disclosure reporting a $4,000 contribution to it by the United Democrats; (6) a Sangamon County Democrats campaign disclosure reporting a contribution of over $2,300 re­ceived from the United Democrats; (7) a Citizens for a Demo­cratic Senate campaign disclosure reporting a $49,000 contribu­tion from the United Democrats; and (8) a Citizens for a Demo­cratic Senate campaign disclosure reporting a $126,700 transfer donation made by it to the United Democrats.

Evidence was presented that a diligent search of the Board's records had been made, but no D-1 statement of orga­niza­tion required by section 9-3 of the Election Code had ever been filed by the United Democrats nor had it filed any reports of campaign contributions received or made by it as required by section 9-10.  As to the complaint filed against the Democratic Party and in response to its claim that the United Democrats was its subcommittee, the Republican Party claimed the Democratic Party's campaign reports were misleading as including campaign contributions made to it or expenditures made by it that, in fact, were made by the United Democrats.

Section 9-3 of the Election Code provides:

"Every state political commit­tee and every local political com­mittee shall file with the [Board], and every local political committee shall file with the county clerk, a statement of organization within 30 days of the creation of such com­mittee."  10 ILCS 5/9-3 (West 1996).

Section 9-10 of the Election Code provides:

"The treasurer of every state political committee and the trea­surer of every local political committee shall file with the Board, and the treasurer of every local po­litical committee shall file with the county clerk, *** reports of campaign contributions and expenditures on forms to be prescribed or approved by the Board."  10 ILCS 5/9-10 (West 1996).

Section 9-11 of the Election Code provides 
inter
 
alia
 that the campaign contributions reports required under sec­tion 9-10 shall disclose:

"(4) the full name and mailing address of each person who has made one or more con­tributions to or for such committee within the reporting period in an aggregate amount or value in excess of $150, together with the amount and date of such contributions;

(5) the total sum of individu­al contri­butions made to or for such committee during the reporting period and not reported under item (4);

(6) the name and address of each politi­cal committee from which the reporting com­mittee received, or to which that committee made, any transfer of funds, in any ag­gregate amount or value in excess of $150, together 

with the amounts and dates of all transfers."  10 ILCS 5/9-11(4), (5), (6) (West 1996).

A local political committee is defined as the candidate himself, or any individual, group, or committee that accepts contributions or makes expenditures during a 12-month period in an aggregate amount exceeding $1,000 on behalf of or in opposi­tion to candidates or in support of or opposition to a public policy question to be submitted to the electors of only one coun­ty.  10 ILCS 5/9-1.7 (West 1996).  The definition of a state politi­cal committee is essentially the same as that for a local politi­cal committee, except that the threshold reporting amount for public policy questions submitted to the electors of more than one county is $3,000.  10 ILCS 5/9-1.8 (West 1996).  "Every political committee shall designate a chairman and a treasurer" and the treasurer "shall be responsible for keeping the records and filing the statements and reports required by this Article."  10 ILCS 5/9-2 (West 1996).

The Democratic Party and the United Democrats responded to the foregoing evidence of violations of the Election Code by main­tain­ing the United Democrats was a subcommittee of the Demo­cratic Party and, as such, was not required to file a section 9-3 statement of organization or a section 9-10 report of campaign contributions and expenditures.  Those respondents asserted that the Democratic Party had, by resolution, created that committee and included in its section 9-10 campaign reports all contri­bu­tions received and expenditures made by it, including those of the United Democrats.  However, a copy of the resolution submit­ted as allegedly creating the United Demo­crats as a subcom­mittee makes no mention of the creation of such subcommittee and section 9-10 campaign reports submitted by the Democratic Party failed to show any receipts from or expenditures to the United Demo­crats.

The proceeding before the Board was a preliminary one and the burden on the Republican Party was quite slight, as it only had to show "justifiable grounds" and that its complaints had 
some
 basis in fact and law.  Under the foregoing evidence, any administrative decision, for whatever reason, dismissing the complaints was clearly contrary to the manifest weight of the evidence and cannot stand.